GUARDIANSHIP OF NORMAN & others.

No. 95-P-1931.

Hampden. June 10, 1996. - October 2, 1996.

Present: SMITH, IRELAND, & GREENBERG, JJ.

*Grandparent. Minor,* Visitation rights.

Where a probate judge granted expansive visitation rights to paternal grandparents pursuant to G. L. c. 119, § 39D, without making the required written findings that reasonable visitation rights would be in the best interests of the children, the visitation order was vacated and the matter remanded for the judge to make the appropriate findings. [406-408]

PETITION filed in the Hampden Division of the Probate and Family Court Department on April 22, 1991.

The case was heard by *Marie E. Lyons,* J.

*James Mitchell Smith* for the maternal grandmother.

The paternal grandfather, pro se.

IRELAND, J. The appellant is the coguardian and the maternal grandmother of three minor children[1] whose mother was murdered in 1991 by the children's father. The father is incarcerated after pleading guilty to second degree murder. The children's paternal grandparents were, at first, appointed coguardians with the maternal grandmother, and they were to share physical custody of the children with her, but they were removed as coguardians after a judge found them both unsuitable to act in that capacity. They were, however, given extensive visitation rights.

The maternal grandmother appeals from that part of a judgment granting the paternal grandparents visitation rights with their three grandchildren. Those rights, we note, exceed

---

[1] The other guardian is the maternal grandmother's daughter, an aunt of the minor children, who resides with the maternal grandmother. The aunt provides much, or most, of the children's day-to-day care.

the rights granted to the paternal grandparents under the original guardianship decree.[2] The judge did not give any reason or make written findings of fact as to why the expansive visitation she ordered is in the children's best interests. Therefore, we vacate that portion of the judgment that granted visitation rights to the paternal grandparents and remand the matter for further proceedings on that issue.

*Factual background.* On April 19, 1991, when the three children (all boys) were ages seven, three, and one, their father murdered their mother. As noted, the father pleaded guilty to second degree murder and is presently incarcerated. Upon learning of their daughter-in-law's murder, the paternal grandparents picked up the three children, drove them to a park, and told them that their mother was dead and had gone to heaven.

Three days after the murder, the maternal grandmother was granted temporary guardianship of the three children. Later the same day, the paternal grandparents filed a petition, also asking for temporary guardianship of the three children. On October 28, 1991, the paternal grandparents and the maternal grandmother agreed to act as coguardians, and a judgment incorporating the parties' stipulations — including one for shared physical custody of the children according to an agreed-upon schedule, see note 2, *supra* — was entered by the Probate Court.

In May, 1992, the maternal grandmother filed a complaint for modification of the guardianship judgment. She requested an order prohibiting further contact between the children and their father, which she alleged had previously occurred without her knowledge while the children were under the paternal grandparents' care. She later amended her complaint to ask for sole guardianship of the children as well. The paternal grandparents filed a cross petition seeking to remove the maternal grandmother as coguardian and to restrict her

[2]Under the original judgment, the children were to reside with the maternal grandmother for approximately five days of each week and with the paternal grandparents for the remaining two days, from 5 P.M. on Saturdays to 7 P.M. on Mondays, and for six weeks each summer. In addition, the paternal grandparents were to visit the children on Fridays from 5 P.M. to 7:30 P.M. Under the new judgment, the children are to visit with the paternal grandparents for *all* of the periods of time stated above and for alternating major holidays and school vacations, and for almost all of the summers as well.

visits with the children. In addition, the father filed a motion to intervene, and the children's paternal great aunt filed a separate petition for sole guardianship.

On June 9, 1992, a Probate Court judge issued temporary orders prohibiting further telephone or face-to-face contact between the three children and their father without order of the court and further instructing that a "structured visitation plan" with the father was to be developed under the guidance of a designated mental health professional. Five months later, the maternal grandmother filed a complaint for contempt, alleging that, contrary to the judge's temporary order, the paternal grandparents were continuing to allow unsupervised contacts between the children and their father. Subsequently, the judge appointed a guardian ad litem for the children, who prepared a report on the situation. All matters (including the maternal grandmother's original complaint for modification, her complaint for contempt, the paternal grandparents' cross petition, the father's motion to intervene in the proceedings, and the children's paternal great aunt's separate petition for sole guardianship) were consolidated for trial. The trial consumed five days of testimony.

After the trial, a judgment captioned "Removal of Fiduciary and Appointment of Successor Decree" was entered removing the paternal grandparents as coguardians of the children and appointing in their place the maternal grandmother's daughter.[3] See note 1, *supra*. The judgment also included the orders here under appeal establishing the paternal grandparents' visitation rights with the children. Those orders included the visitation rights contained in the original decree, plus additional visitation rights for every other Easter, Thanksgiving, Christmas, Thanksgiving school vacation, Christmas school vacation, February school vacation, April school vacation, and for every summer school vacation. Finally, the decree ordered visitation between the children and their father once every six months "in the presence of a mental health professional."[4]

One month after entry of the judgment, on July 8, 1994, the judge issued a memorandum containing extensive findings

---

[3]The paternal grandparents' petition against the maternal grandmother was dismissed in a separate judgment and is not under appeal.

[4]The judgment provides that either the maternal grandmother or the paternal grandparents may seek review of the visitation schedule with the

of fact and rulings of law. The judge's findings focus in large part upon the paternal grandparents' and the maternal grandmother's conduct as coguardians and not at all upon the subject of visitation with the paternal grandparents or whether such visitation would be in the children's best interests. The judge found that the maternal grandmother and the paternal grandparents had not been able to communicate effectively with each other concerning the children, nor had they acted in concert to further the children's best interests. More strikingly, the judge found that the paternal grandparents had acted "unilaterally [i.e., without seeking the advice of the maternal grandmother, the therapists who were counseling the children, or the court] against the best interests of the [children]." Specifically, the judge found that the paternal grandmother had "facilitated" telephone, mail, and face-to-face contacts at the prison between the children and their father without prior discussion or consultation with the maternal grandmother, who she knew would disapprove, or with either therapist then working with the children.

The judge found the paternal grandfather unable or unwilling to control his wife's "inexplicable behavior" and, therefore, ruled that he, too, was unsuitable to act as a coguardian. The paternal grandmother's actions, according to the judge, were done "with complete disregard to the [children's] emotional health" and furthered her son's best interests at the expense of the children's. The judge also found as a fact that the paternal grandparents had violated the temporary order barring further contact with the father by allowing unmonitored telephone conversations to occur between him and one or more of the children while the children were visiting at the paternal grandparents' home.[5] The judge ruled that the paternal grandparents had not come to terms with the circumstances of their daughter-in-law's death and had been less than truthful with the children about the matter, preferring to tell them that the father had killed the

father if, in the opinion of the mental health professional, the visits with the father have a negative impact on the children.

[5] At trial, the paternal grandmother continued to deny that her facilitation of these contacts was inappropriate, and, at one point, she stated she had not informed the maternal grandmother about the contacts because the oldest child, a boy less than ten years old at the time, had asked her not to tell his grandmother about them.

children's mother by accident or that her death had been "a mistake."

By contrast, the judge found that the maternal grandmother and her surviving daughter had "always acted in the [children's] best interests." Despite the father's having killed the children's mother, both maternal relatives had been able to promote a relationship between the children and their paternal grandparents, and they had assured the judge that they would continue to do so and would also cooperate with any court-ordered visits with the father. The same cannot be said of the paternal grandparents, who stated in their petition seeking sole guardianship of the children that they would restrict the maternal relatives' visits with the children to occasional supervised contacts. The judge found that the paternal grandparents would withhold visits between the children and the maternal relatives for a period of three to six months if they were declared sole guardians, and also that they would attempt to keep the oldest child apart from his two younger brothers as much as possible. The judge concluded that the paternal grandparents "are unsuitable as coguardians" and are "incapable of acting in the best interests of the [children]."

*Discussion.* Visitation rights of the grandparents of minor children whose parent, or parents, are deceased (or divorced, married but living apart, or under an order for separate support) have been recognized in the Commonwealth since 1972, when G. L. c. 119, § 39D, was enacted. See St. 1972, c. 631.[6] All fifty States have adopted similar provisions. See 3 McCahey, Kaufman, Kraut, Gaffner, Schwartz, & Silverman, Child Custody & Visitation Law and Practice § 16.12[3] (1996). As in Massachusetts, a substantial majority of States

---

[6]General Laws c. 119, § 39D, as amended through St. 1991, c. 292, provides in relevant part:

"If the parents of an unmarried minor child are divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased, . . . the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court *upon a written finding that such visitation rights would be in the best interest of the said minor child* . . . " (emphasis added).

explicitly tie grandparents' rights to visitation to the best interests of the grandchildren. See, e.g., Cal. Family Code §§ 3103, 3104 (West 1994); Fla. Stat. § 61.13(2)(c) (1995); Ill. Comp. Stat. ch. 775, § 5/11-7.1 (1994); Minn. Stat. § 257.022 (1995); N.H. Rev. Stat. Ann., § 458.17-d (1992); N.Y. Dom. Rel. Law § 72 (McKinney Supp. 1996); 23 Pa. Cons. Stat. Ann. § 5311 (Purdon 1991); Wis. Stat. Ann. § 767.245 (West 1993). See also Annotation, Grandparents' Visitation Rights, 90 A.L.R.3d 222, 232 (1979). In particular, G. L. c. 119, § 39D, states that "reasonable visitation rights" may be granted "upon a written finding that such visitation rights would be in the best interest of the . . . minor child" — a finding conspicuously absent in the decree itself or in the accompanying findings of fact. The judge, in making her visitation orders, committed error because she did not comply with the statute's prerequisite for granting visitation rights.

In her visitation orders, the judge preserved and, indeed, expanded in the paternal grandparents' favor a shared physical custody arrangement of the children between both sets of grandparents, while placing exclusive legal control of the children with the maternal relatives. The expansion was made despite the judge's detailed findings that in critical respects the shared physical custody and guardianship arrangement had not worked out and that the two sides of the family had been unable to cooperate or work together effectively toward furthering the children's emotional welfare. Detailed findings that the expansive visitation ordered on behalf of the paternal grandparents would be in each child's best interests are particularly crucial here, given the judge's conclusions that, in their role as coguardians, the paternal grandparents had been "incapable of acting in the best interests of the [children]" and that they had also violated the court's earlier June 9, 1992, no-contact order with the father.

Finally, we point out that G. L. c. 119, § 39D, allows the judge, within her discretion, to grant grandparents "*reasonable* visitation rights" (emphasis added) upon making the necessary best-interests findings. In keeping with the statute, therefore, specific findings should also be entered upon remand that any visitation ordered is "reasonable" under the

unusual and unfortunate facts of this case. The judgment is vacated as it pertains to visitation rights between the paternal grandparents and the three children. In all other respects, the judgment is to stand.

*So ordered.*